1. There was no error in overruling the demurrer to the petition for citation or rule nisi for contempt. Pedigo v. Celanese Corporation of America (case 16,581), 205 Ga. 392 (1).
2. It does not appear that the judge abused his discretion in overruling the motion for a continuance of the contempt hearing, based solely on alleged lack of opportunity of leading counsel to prepare for trial, nothing being shown as to inability or lack of opportunity of other attorneys in the case to prepare for such trial. Code, § 81-1419; Cooper v. Jones, 24 Ga. 473 (4); Thomas v. State, 92 Ga. 1, 8
(18 S.E. 44); Blackwell v. Jennings, 128 Ga. 264 (1) (57 S.E. 484); Dennard v. Farmers Merchants Bank of Coolidge, 151 Ga. 445 (107 S.E. 56).
3. In contempt proceedings for alleged violation of a restraining order which is predicated on a petition for injunction, persons not made parties to the original petition, and not shown to have had actual knowledge of the restraining order, are not subject to attachment for contempt for such alleged violation of the order. But where a restraining order is issued, persons who have actual knowledge thereof, though not parties to the petition for injunction on which the restraining order was issued, are subject to attachment for contempt for a violation of its terms. Corley v. Crompton-Highland Mills, 201 Ga. 333 (39 S.E.2d 861).
4. Whether a contempt of court has been committed in the violation of an injunctive order, and how it shall be treated, are questions for the discretion and judgment of the court that issued the order, and its discretion will not be interfered with by this court unless there is an abuse of discretion. If there be any substantial evidence from which the judge could have concluded that his order had been violated, his finding to that effect cannot be disturbed by this court, in so far as sufficiency of the evidence is concerned. Patten v. Miller, 190 Ga. 152 (5) (8 S.E.2d 786); Pedigo v. Celanese Corporation of America (No. 16,581), 205 Ga. 392.
5. Under the rulings stated in the two preceding notes, as applied to the evidence in this case, it does not appear that the judge abused his discretion in adjudging the respondents, S. T. Alred, Chesley Gaines, and W. S. Robertson guilty of contempt in participating, with others, in blocking the entrance of a train into the plaintiff's premises in violation of the restraining order and as charged in the petition for citation. *Page 500 
(a) The person first named was a party to the original petition upon which the restraining order was issued, and he testified that at the time of the alleged violation he stated to the plaintiff's attorney, "We knew all about the" injunction. Although the other two were not parties to the original suit, the evidence authorized a finding that they acquired actual knowledge of the provision of the restraining order alleged to have been violated, through an announcement made by the plaintiff's attorney at the scene of the alleged violation. Also, as to these three persons, the evidence was sufficient to authorize a finding that all of them, after acquiring such knowledge, participated in blocking the entrance of the train into the plaintiff's premises, in violation of the terms of the restraining order, and as charged in the petition for citation. Corley v. Crompton-Highland Mills, 201 Ga. 333
(4) (supra); Lassiter v. Swift, 204 Ga. 561
(50 S.E.2d 359); Huckaby v. Griffin Hosiery Mills, 205 Ga. 88
(2) (52 S.E.2d 585).
(b) The plaintiffs in error, J. L. Bowman, Troy Cline, E. J. Ellis, and Hubert Summerville, were not parties to the injunction suit; nor did the evidence show that they had any knowledge of the restraining order.
(c) Although the testimony of Billy Marion Ingram, not a party, showed that he heard the announcement made by the attorney as referred to above, and that he and others were "over there to see that our signs weren't knocked down, or taken off the track," neither his testimony nor other evidence in the case showed that he did anything toward blocking the train, or that he aided or abetted others to do so, after the attorney's announcement; nor was there any evidence as to previous knowledge on his part.
(d) As to the remaining plaintiffs in error, Joe Poole, W. V. Smith, Davis Whorton, and Jack Thomas (a party), there was no sufficient evidence to show violation of the restraining order in the manner alleged in the petition for citation; the only violation charged in such petition, construed most strongly against the petitioner, being the alleged blocking or preventing entrance of a designated train into plaintiff's premises.
(e) Accordingly, the judgment adjudging the twelve plaintiffs in error guilty of contempt of court is affirmed in so far as S. T. Alred, Chesley Gaines, and W. S. Robertson are concerned, but is reversed as to the remaining plaintiffs in error.
Judgment affirmed in part, and reversed in part. All the Justices concur.
 No. 16583. JUNE 15, 1949. REHEARING DENIED JUNE 28, 1949.
There are twelve plaintiffs in error in case No. 16,583, now to be considered, namely: S. T. Alred, J. L. Bowman, Troy Cline, E. J. Ellis, Chesley Gaines, Billy Marion Ingram, Joe Poole, W. S. Robertson, W. V. Smith, Hubert Summerville, Jack Thomas, and Davis Whorton. They were adjudged in contempt of court December 6, 1948, on a petition for citation filed by Celanese Corporation of America on November 18, 1948, and *Page 501 
a rule nisi that was issued thereon. It appears that the trial began on December 2. The petition for citation alleged that these twelve and four other persons named (besides others not named) had violated the restraining order issued on October 25 by the doing of certain acts set forth in said petition for citation; the allegations of said petition being as follows:
1. "That it [Celanese Corporation of America] filed in this court on the 25th day of October, 1948, its verified petition for injunction and other relief, which was docketed as above shown; and a temporary restraining order was granted by this court as will be seen by reference to such proceedings, restraining named persons individually and as representatives of that class of persons who are members of the Textile Workers Union of America . . and their allies and confederates, specifically from blocking any entrance of the plaintiff, and from maintaining any mass picketing at any entrance of the plaintiff, and from blocking any entrance for ingress or egress on foot or by vehicles of any person or persons desiring to enter or leave petitioner's premises or to deliver goods thereto or dispatch goods therefrom."
2. "On November 18, 1948, the Southern Railway Company sent an engine to deliver several cars of freight to plaintiff. As it entered the track to plaintiff's premises and plant it was met by S. T. Alred, Davis Whorton, Joe Poole, Chesley Gaines, J. Milburn Fowler, Billy Marion Ingram, W. S. Robertson, Jack Thomas, E. J. Ellis, Troy Cline, Hubert Summerville, Dan S. Pugh, W. A. Cornett, W. V. Smith, H. A. Martin, J. L. Bowman, and a large number of other striking employees who were massed on and across said track so as to make it impossible for said train to enter said premises and plant."
3. "That an attorney for said plaintiff was present and told said named defendants that there was a restraining order by the Superior Court of Floyd County, Georgia, restraining them from interfering with said train or from blocking the entrance to said plant. The said Alred then replied, `We don't give a God damn about any injunction, and we ain't going to move. The train is bigger than we are and he can run over us if he wants to, but they ain't going to move this sign and you ain't either.'" *Page 502 
4. "That all of said defendants were then, notwithstanding said injunction, massed in and on said track and did by force prevent said train from entering plaintiff's plant."
The prayer of the petition was that citation issue requiring the respondents named to show cause "why they should not be adjudged in contempt of the orders and processes of this court and punished accordingly."
Other than the allegation contained in paragraph 3 of the petition as above quoted, as to the statement to the defendants by the attorney for the plaintiff, there was no averment in this particular petition for citation that the defendants had knowledge of such restraining order.
Counsel for the respondents made the following motion: "If it please the Court, I would like to interpose and make the following motion. As Your Honor is well aware, on the 26th day of November, 1948, Your Honor directed the defendants and each of them in the cases pending under case 2741, Celanese Corp. of America v. J. D. Pedigo et al. to employ leading counsel to represent them in actions pending thereunder, and I was named and designated as leading counsel for these defendants, and Your Honor is well aware of the fact that since Friday, November 26, until this date I have been constantly engaged in the preparation and trial of the main issue, that is, case 2741, and because of such fact it has been utterly impossible for me to discuss the questions involved in these citations for contempt, that is, cases 3249 and 3258, designated for trial today, with any one of the defendants named therein or to interview a single witness in the cases or even to read the citations, for all of which reasons I am wholly unprepared to go to trial and do the defendants justice in the cases. I therefore move a continuance to a later date."
It is stated in the bill of exceptions, "the court then and there orally overruled said motion for continuance with the statement that there would be no more continuances and that the cases would proceed to trial."
After hearing evidence, the judge on December 6 adjudged twelve of the named respondents (plaintiffs in error) guilty of contempt as alleged in the petition for citation, and imposed on them respectively the following penalties: S. T. Alred, a fine *Page 503 
of $200 and imprisonment for 20 days; Chesley Gaines and W. S. Robertson, each a fine of $200 and imprisonment for 10 days; J. L. Bowman, E. J. Ellis, Billy Marion Ingram, Joe Poole, W. V. Smith, Hubert Summerville, Jack Thomas, and Davis Whorton, each a fine of $150 and imprisonment for 5 days; Troy Cline, a fine of $100. Only two of these respondents, namely, Alred and Thomas, were parties to the suit for injunction.
The assignments of error in the bill of exceptions sued out by the above named twelve persons are that the judge erred in: (1) overruling a demurrer to the petition for citation, which demurrer (except ground 2, which is not relied on in this court) was substantially the same as the demurrer that was filed in No. 16, 581, Pedigo v. Celanese Corporation of America, 205 Ga. 392; (2) overruling the motion for continuance of the contempt hearing; (3) adjudging these twelve respondents guilty of contempt; it being contended among other things that the order adjudging the respondents guilty of contempt was contrary to the evidence and without evidence to support it; also that such judgment amounted to an abuse of judicial discretion.
Preceding the certificate to the bill of exceptions, the trial judge made the following statement as to additional facts which were before him and were considered by him in ruling on the motion for continuance:
"The foregoing bill of exceptions having been tendered and presented, I do certify that in addition to the recitations contained in said bill of exceptions and particularly in connection with the motion for continuance as set out on page three of said bill of exceptions, that on the 30th day of October, 1948, and during a discussion on the main bill, that is, the petition for injunction being No. 2741, counsel for the defendants stated that Isadore Katz was leading counsel in said case, and in all of the citations then filed in connection with said matter, at said time the defendants were represented by Isadore Katz and Dave Jaffe of New York, and the firm of Wright 
Scoggin of Rome, Georgia; that thereafter on November 5, 1948, a petition for removal to Federal court was filed and at that time the respondents were represented by Isadore Katz, Dave Jaffe, Wright *Page 504 
Scoggin, Poole, Pearce Hall, Warren Hall, and C. E. Gregory Jr.
"Thereafter on November 17, 1948, said matters came on for hearing, and it was stated in open court that Graham Wright of the firm of Wright Scoggin was then leading counsel, inasmuch as Mr. Katz had absented himself from court without leave of court for the purpose of attending a convention, and the said Katz did not appear in court any more, and at said time, the said Dave Jaffe and Warren Hall were present in court assisting the said Graham Wright and his partner Robert Scoggin, a continuance was requested in said matters on the 17th day of November, 1948, and the balance of said cases were continued until the 22nd day of November, 1948, at the request of the respondents.
"That thereafter on the 22nd day of November, 1948, said matters so set came on for hearing and the attorneys representing the respondents who were present in court at said time were Graham Wright, Robert Scoggin of the firm of Wright Scoggin, Dave Jaffe of New York City, and Warren Hall of the firm of Poole, Pearce Hall of Atlanta, Georgia, the hearing in said matter proceeded until Wednesday, November 24th, at which time the said Dave Jaffe requested leave of absence of the court, and the court refused the leave of absence, stating that there had been too much delay in the hearing of said matters at this time, and that practically all said delay was caused by respondents' counsel and by the respondents, and that the hearing in said matters would continue on Thursday and Friday November 25th and 26th; notwithstanding this, the said Jaffe returned to New York City and was not present in court thereafter, and on November 25th a motion was made for continuance because of the illness of Graham Wright of the firm of Wright Scoggin. Attorneys (sic) of the respondents present in court at said time was Robert Scoggin, the said Warren Hall having absented himself without leave of the court, and the said Jaffe being absent after refusal of a request by him for leave of absence. On said November 25th the court instructed the respondent to obtain leading counsel, as there would be no further continuance in these matters on account of the absence of the attorneys, no legal showing having been made as to the illness of *Page 505 
said Graham Wright, but the court acting in its discretion, having granted continuance because of such reported illness, and the court did not feel that any further delay because of absence or illness of counsel was justified, nor would it be permitted.
"Thereafter M. G. Hicks was employed by the respondents and appeared in court on Monday and Tuesday, November 29th and 30th, from 9 o'clock a. m. until about 5 o'clock p. m., and on Wednesday, December 1st, upon the completion of the hearing of the main case and the sounding of this case, the respondent (sic) made a motion for continuance at about 3 o'clock p. m., whereupon said cases were continued until the following morning December 2nd at 9 o'clock a. m. Present in court at said time representing the respondent (sic) and defendants were M. G. Hicks, Charles Culbert, and Robert L. Scoggin; the said Isadore Katz, Dave Jaffe, and Warren Hall were not present, nor was any reason given for their failure to be present."
J. R. Crang, a witness for the plaintiff, testified: I am a yardmaster of Southern Railroad in Rome, Georgia. We attempted to place 15 cars on spur track of Celanese Corporation on the afternoon of November 18, 1948. No, we weren't able to place those cars, because of the men in the track and picket signs on the track and they would not be removed. If we had gone in and they hadn't moved when we got up to them, they would have been in danger of injury or being killed. They did not move. I didn't ask them to let us pass, I was present but Mr. Claybourne, Superintendent, Atlanta Division, was there at the time, and he asked them to move back, that the Southern didn't have no strike on, and asked us to go through, and they says, "No," you could run over us or run over the pickets, but they wasn't moving. I do not know any of these pickets. There were between sixty and seventy-five pickets standing between the rails of the tracks. Mr. Jack Rogers made a statement to them about there being an injunction. They told him they knowed there was an injunction and told him there was an injunction there. The picket said he knew there was one injunction on it and he didn't care anything about it being on there, something about it, some remark like that. That they wasn't going to let us in. I desired to place that string of cars, we would have placed it if there wasn't nobody on the track. *Page 506 
James C. Burdett, for the plaintiff, testified: I am employed by Celanese Corporation as night superintendent. On November 18, 1948, at 3 p. m., I went with several others down to the spur track of the Southern Railway. While I was there I saw Jack Thomas there.
The plaintiff introduced an affidavit signed by Harrison King and several other affiants, the material portions thereof being as follows: "1. We are employed by the Celanese Corporation of America in Rome, Georgia. At about ten minutes of three in the afternoon on November 18, 1948, we left the south gate and walked down the railway siding towards the company property line where the Celanese property joins the right of way of the Southern Railway. The tracks of the Southern Railway are situated on a fill at this point, and when we arrived there about 3 p. m. there were 75 or 80 pickets massed on or very close to the track and completely across the fill so that it was impossible for anyone to get through said line and mass of pickets. A Southern Railway freight train carrying coal cars and other cars for delivery to the mill was stopped approximately 15 feet outside the Celanese property line. We found that there was a sign in the middle of the tracks which was attached to an angle iron that had been driven between the crossties in the middle of the track. This sign carried in big letters the words `On Strike' and was located about one or two feet inside the Celanese property line. 2. Mr. Jack Rogers, a Celanese attorney who had accompanied us, walked down the tracks from the Celanese property sign and asked the pickets to let him through their line. The pickets refused, and told Mr. Rogers that he would have to go around the sign, and at the suggestions of one of the pickets an opening through the mass and off to the side of the tracks was made so that the said Rogers could get by. Mr. Rogers then went around the sign to a point between the train and the pickets and told the pickets, `So that there will be no misunderstanding, I want to remind you that there is an injunction issued by the Superior Court of Floyd County that prohibits the stopping of trains coming into the Celanese Plant.' Whereupon, one of the pickets, Mr. S. T. Alred, replied, `We don't give a God damn about any injunction, we ain't going to move. The train is bigger than we are and he can run over us *Page 507 
if he wants to, but they ain't going to move that sign and you ain't either. You ain't no judge. Who is the judge? That God damn Nick Nichols. If you want our names, let's give `em to you. I am S. T. Alred.' After Mr. Rogers had finished making his statement and had started to walk back to the plant, Mr. Alred then proceeded to violently curse Mr. Rogers, using profane and abusive language. While we were standing there witnessing this last incident, some or all of us recognized by face the following striking employees," naming among others the twelve persons who are now plaintiffs in error. "3. As we started to return to the plant at about 3:15 we saw the train start to move off towards town."
W. Y. Brown testified for the plaintiff on cross-examination: "I made affidavit that I was present on November 18th, when the train came into the entrance of the Celanese Plant. I was in the company of J. Ellis Hale, Mr. W. H. Akin, Mr. F. D. Carey, Mr. Harrison King, and Mr. Wright Hudgins, including Mr. Rogers. Yes, Mr. Alred is the only one whom I observed did or said anything during the incident. There were a lot of them talking, but I believe Mr. Alred was the only one that talked to the railroad officials and Mr. Rogers. I remember one man trying to hold Mr. Alred in check. That was one of the strikers. The others blocked the right-of-way. Three I know, Mr. Alred, Mr. Robertson, and Mr. Gaines. They refused to get off the right-of-way. No, we did go on by. Nobody told us we couldn't go. Nobody told each of us we couldn't go. I didn't hear anyone tell the railroad officials in my presence that they couldn't proceed." On redirect examination: "Yes, in my affidavit I stated that I heard a remark about the injunction. After that nobody got off the track for the train to pass. The train then proceeded back to Forrestville." On recross examination: "I don't know who ordered them to go back to Forrestville, unless it was the train crew. No, sir, I didn't hear any of the railroad officials or employees say why they didn't go on in at the time."
The respondent S. T. Alred, who was also a party to the injunction suit, testified substantially as follows: "I was on the railroad track leading into Celanese Corporation around 3 o'clock on the afternoon of November 18, 1948. The train was pulling *Page 508 
up and "this gentleman that was on the stand [Mr. Lang] was flagging it down, as I went up the side of the train, he flagged it down about fifteen feet from the sign, and I walked around behind the sign. . . I did not do anything to stop that train. . . After the train had stopped for a couple or three minutes, Mr. Jack Rogers and his bunch of Celanese officials came down the track off the Celanese property and Mr. Jack Rogers was leading them on . . walking right up the middle of the track. . . Mr. Jack Rogers kept spreading them apart and walked to where I was . . and said `Excuse me,' and I told him, we don't excuse you to move that sign. The sign is not going to be moved by you or nobody of your bunch. I told him the sign was going to stay and it's not bigger than the train. If the train wants to run over the sign, let it run over it. It's only made out of very thin plywood, with a little wooden stick standing up between a little old waste basket. . . I did not tell the railroad official that he could not move the sign. He didn't ask me anything. Mr. Rogers . . said he just wanted to remind us there was an injunction against mass picketing, and I told him we knew all about the God damned injunction. That just the way it was spoke, I said, `You'll have to let Judge Nichols pass on that. You can't do it out here.' No sir, I didn't say, `Who is the judge? that God damned Nichols.' . . I did tell him I knew about the injunction. I think some of them did some talking besides me. . . Some of the pickets down there were W. S. Robertson and Mr. Chesley Gaines. Hubert Summerville was there. Jack Thomas came up, but after the train stopped, and I believe he came up just about the time it was pulling out [to] go back the other way. Altogether I would say there were about 40 or 50 down there — up and down the shoulders of the track. Mr. Robertson and Mr. Gaines were the only ones on the track outside of myself. I drove my car up on the side of the road and saw the train coming in and went over there to see what they were doing. There were a few there that when I got there but they kept coming. The pickets there that day — we didn't have discussion about stopping or trying to stop the train. Mr. Rogers was shaking his finger at me and trying to make me mad. I told him that, if the train wanted to run over the sign, it could. I meant me and the ones standing there by the track, holding *Page 509 
it, when I told him we weren't going to let them take the sign down."
The entire testimony of the respondent Jack Thomas, who was also a defendant in the injunction suit, was: "I am one of the striking employees of Celanese Corporation. I have worked with them for ten years. Yes, on the 18th day of November, 1948, I was out on the railroad track of Southern Railway leading into the Celanese plant. It was around 3 in the afternoon. The train was already there when I got over there. No, Sir, I don't know how long it had been there. I was coming from town and I seen the train sitting over there and a big crowd and I just — it was about 200 yards off the Chatillon Road; got off and went over there. They were all leaving when I got there. The Celanese officials was going back down the track and the train pulled out in about five minutes after I got there. No, sir, I didn't hear any conversation between Mr. Alred and Mr. Rogers. No, sir, I didn't go over there to do picket duty. Just a spectator. I went to see what was going on. No, sir, I didn't talk to anyone about stopping a train over there. No, sir, I didn't hear anybody say anything like that. I don't know whose property it was we were on. I was on Southern Railroad property. No, sir, I didn't see anyone interfere with the train or its crew."
Four of the respondents, namely, J. L. Bowman, Troy Cline, E. J. Ellis, and Hubert Summerville, stated in their testimony that they did not hear the conversation between Rogers and Alred, as set forth in the petition for citation and the affidavit introduced on behalf of the plaintiff. The material portions of the testimony of the four respondents just named were as follows:
J. L. Bowman: I am a striking employee. On November 18, 1948, I was at the spur track of Southern Railway at the entrance to Celanese. There was no train on the track when I got there. I went over by myself. I went over there to see a Negro about a dog he had that I was going to buy. I was there when the train came in. I didn't go over there to do picket duty. I didn't go over there with the intention of stopping the train. I didn't do anything to prevent it from going in. I was there when it came up. I saw Mr. Jack Rogers over there. I didn't hear no conversation. I just seed Mr. Rogers, he said to get back, I want to get to that sign. Nobody said anything that I heard, *Page 510 
just a big crowd came up there. I didn't put the sign there. I don't know who did. I didn't know there was a picket post there until that day.
Troy Cline: I am one of the striking employees of Celanese. On the 18th day of November, 1948, I was out on the spur track of the Southern Railroad leading into the Celanese Corporation plant. It was something after 3. I was coming from town and I saw the train stopped over there and a pretty good-size bunch of folks. I decided I'd stop and go over too. I went out of curiosity. I didn't go over there to be on picket duty. The train was already there when I got there. I didn't hear any conversation between Mr. Jack Rogers and S. T. Alred. It did not occur in my presence.
E. J. Ellis: I am a striking employee of Celanese Corporation. On November 18th, I was over on the Southern Railway spur track leading into the Celanese Corporation. I got there after 3. The train was already there when I got there. I was going from the commissary home and I saw the train stopped and so I just went over there to see what was going on. I saw a lot of people over there and the train stopped so I went over there. I made no effort to keep the train from going in. I didn't say anything to any railroad official or the officials of Celanese. I wasn't there when Mr. Rogers and Mr. Alred had their conversation.
Hubert Summerville: I am one of the striking employees of Celanese Corporation. On the 18th day of November, 1948, I did go out on the Southern Railway spur leading into the Celanese Corporation property. I was there about 3. I started over to the commissary, and the party that I was with — we saw a crowd over there and we stopped to see what was going on. I just saw a crowd on the side of the road there and on the railroad. We didn't discuss the question of preventing the train from going into the plant. I didn't go over there with any such thing in mind. I didn't go over there to be on picket duty. I saw a bunch of Celanese officials coming up the track, and there they came and said something to Mr. Alred about moving their sign. Mr. Rogers, I didn't understand what he said to Mr. Alred, because I am hard of hearing. I didn't see anybody do anything with reference to stopping this train or keep it from *Page 511 
going in. I didn't leave before the crowd did. I'd say there was about 20 or 25 people on the track before I went over there out of curiosity. I'd say there was around 50 or 60 all of them over there, but about 25 on the track. That included the Celanese and railroad officials at the track.
The respondents Chesley Gaines, Billy Marion Ingram, Joe Poole, W. S. Robertson, and Davis Whorton testified in part as follows:
Billy Marion Ingram: I know where the spur track of the Southern Railway is coming into the plant. I was over there November 18, around 3 p. m. A train came down the track. I didn't do anything to interfere with the train going into the plant. I heard some conversation between Mr. Alred and Mr. Rogers. Mr. Rogers came up and asked if he knew there was a superior court injunction against mass picketing, and Mr. Alred said something about he'd let Judge Nichols decide the injunction or something to that effect. I didn't hear him say, `that God damned Nichols.' I was close enough to hear him if he had said it. I was over there doing picket duty that day. We were there to see that our signs weren't knocked down, or taken off the track. If they were to put them back up there. I didn't hear Mr. Alred tell Mr. Rogers that he didn't care anything about the God damned injunction. If he did, he said it mighty low, otherwise I would have heard him.
Chesley Gaines: I was on the Southern Railway spur track leading into Celanese on the 18th day of November, 1948. I got there about 2:30. I was just over there talking with the boys on picket duty. I did not go over there with the intention of stopping a train. I didn't say anything to anyone as to whether or not they might run the train into the plant. I didn't hear anyone else make any such statement. I heard what was said between Mr. Alred and Mr. Rogers. Mr. Rogers says, `Did you know there was an injunction against this?' I don't know as he said picketing, but I think he did. There's a court injunction against this picketing here, the way I understand it. Mr. Alred said, `God damn the injunction.' I only just said a few words to Alred. I told Alred to be quiet and let's not have any more of that profanity. I was not encouraging anyone to do anything to stop the train. I didn't suggest to anyone at any time *Page 512 
that the train be stopped and not allowed to go in. I was not standing between the rails. Alred was standing between the rails and I was on one end of the picket. I had my hand on one end of the picket sign on the lower side. If I hadn't stepped off the track, when the train came through it would have hit me. The pickets were there on picket duty. Their duty was to hold the sign there, and if the train wanted to stop, let it, if not get out of the way, I suppose. I heard Mr. Crang, a few minutes ago. I didn't hear him ask them to let the train go in. He says, "Boys are you going to stand your ground?" and I told him we certainly were.
Joe Poole: I was on the spur track of the Southern Railroad adjacent to the Celanese Corporation. We had started over to the commissary, and some of them suggested we go over on the railroad and see how things were going over there. There was a picket sign in the middle of the track. It was there previously, I do not know who put it there. There were four of us that went together. There was no discussion of what we were going to do when we got there. We didn't say anything about stopping a train if one attempted to go in. After we were there a couple of minutes we looked down the track and we saw Mr. Rogers and his crew coming up from the plant. I decided and I imagine the rest of them decided we'd wait and see what was going to happen. Mr. Rogers and Mr. Alred were talking. When he first came up, he asked them to get out of the way or excuse him, or something like that and tried to go through, and he couldn't do it. He told him (Mr. Rogers told Mr. Alred) that he knew there was an injunction in the superior court or something to that effect, and Mr. Alred told him, `Yes,' he knew there was an injunction in effect, but he didn't think Mr. Rogers was the judge and it would have to be passed on by the judge. No, Mr. Alred did not say, "Who is the judge? That God damned Nichols." He didn't say that. He said, "You're not the judge, Judge Nichols will have to rule on it." I'm not one of the regular pickets. I work at the commissary, is where I do my work, yes, I work on picket line in the morning. No, I didn't object or protest to anything Mr. Alred said. It was him, a private fight between him and Mr. Rogers.
W. S. Robertson: I was on the Southern Railway spur track *Page 513 
leading into Celanese Corporation about 3 p. m. There was not a train in there when I got there. It got there immediately after I got there. I'd started over to the commissary. I thought I would see what was going on. Joe Poole, Mr. Summerville, and Dave Whorton went with me. We didn't discuss stopping and keeping the train from going in. We didn't go over there with that intention. I didn't go over there to do any picket duty. There was a crowd over there and we decided we'd go over and see. I heard Mr. Alred and Jack Rogers talking. I didn't assist Mr. Alred in what he did or said. No, sir, nobody else as I could see did either. I don't know who put the sign up. I didn't help put it up. Mr. Claybourne was coming down the track as I did and we talked a little. He said, if we'd hold that sign, they would not go in. Mr. Alred and I were standing pretty close, about 3 or 4 feet apart.
Davis Whorton: I was at the Southern Railroad spur track leading into the Celanese plant on the 18th day of November, 1948. I was present when the train backed in. Nobody did anything towards stopping that train. I didn't see anyone do or say anything more than just having the sign on the tracks, is all that I saw. The sign was already there so far as I know. I don't know who put it there. I'd say down on the track up and down the shoulder there were between 15 and 25 people down there. Nobody that I know of told the train crew they couldn't go in there. I didn't know the train was coming on. I'd started to the commissary over there, and we decided to go over on the railroad a little while. I went over there in my car, after we got out of the car we walked something like 100 or 150 yards to get over there. We just went over there, that is all. I have been on the picket line a great deal. I saw Mr. Alred there. I didn't hear him say, `We don't give a damn about the injunction.' He said he knew about the injunction, when Mr. Rogers said what he did, he knew about the injunction. He was holding the sign. He said the train was larger than we, and if they wanted to run over the sign, they could do it. I can't explain my reason for going over there, except that I just went over there for no particular reason. No, sir, I didn't leave when more pickets came up. Yes, sir, I only joined in with them to the extent of being there. *Page 514